# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lynn M. Kipp,        :
      Appellant     :
             :
     v.         :
             :
Bellefonte Area School District,   :
Board of School Directors,    :
Michelle Saylor, Michelle Simpson,   :
Kimberly Sharp, Nicolas Downs,   :   No. 263 C.D. 2023
Nicole Harris, and Michael Mussett   :   Submitted: August 8, 2025

BEFORE:   HONORABLE ANNE E. COVEY, Judge
      HONORABLE CHRISTINE FIZZANO CANNON, Judge
      HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON        FILED: October 7, 2025

    Lynn M. Kipp (Kipp) appeals *pro se* from the June 19, 2020, order of the Court of Common Pleas of Centre County (trial court) granting in part the motion to seal certain exhibits to Kipp's previously filed complaint in this matter. Kipp also appeals the trial court's December 19, 2022, order sustaining preliminary objections filed by Appellees in this matter and dismissing with prejudice Kipp's Fifth Amended Complaint. Upon review, we affirm the trial court's June 19, 2020, order, vacate in part its December 19, 2022, order, and otherwise affirm. We also grant Appellees' motions to strike Kipp's reply brief and appendices to the extent that they contain extra-record allegations and evidence.

## I. Factual and Procedural Background

Kipp filed her first complaint in January 2020. Appellees are the Bellefonte Area School District (District) and Board of School Directors (Board), former School Superintendent Michelle Saylor (Saylor), District Human Resources (HR) Director Michelle Simpson (Simpson), teacher and local teacher's union president Kimberly Sharp[1] (Sharp), teacher Nicolas Downs (Downs), teacher Nicole Harris (Harris), and teacher Michael Mussett (Mussett). Fifth Amended Complaint, Oct. 3, 2022, at 3-5.

Kipp avers that she had been a highly rated full-time teacher at an elementary school in the District since 2011 and an active teacher's union member for 17 years when the events giving rise to her lawsuit began. Fifth Amended Complaint at 6-14. In early April 2018, she reported to her school's principal that her students were given snacks during the prior year's Pennsylvania System of School Assessment[2] (PSSA) tests, which she believed violated testing protocols. *Id*. at 14. The principal decided that each teacher could decide whether to allow snacks during testing. *Id*. at 16. A news story soon came out about a teacher in another district who had given snacks during testing and been suspended. *Id*. After Kipp engaged in several meetings, discussions, and encounters with other staff and

---

[1] Sharp retained counsel separately from the other Appellees. To the extent her issues differ from those of the other Appellees, this Court will address them individually and distinguish the other Appellees as the "District Appellees." When Sharp's issues coincide with those of the other Appellees, they will be addressed collectively as "Appellees."

[2] These tests are given to all Pennsylvania students from third grade through eighth grade and are used to measure proficiency compared with state academic standards in English, math, and science. *See* https://www.pa.gov/agencies/education/data-and-reporting/assessment-reporting (last visited October 6, 2025).

teachers, Downs filed a formal complaint in April 2018 asserting that Kipp unlawfully harassed him; Simpson, the HR director, signed the complaint. *Id*. at 18.

At a May 2, 2018, meeting with a union representative present, Simpson told Kipp that a complaint had been filed against her that was being investigated and that the details and complainants' names were confidential under District policy. Fifth Amended Complaint at 24-26. Simpson told Kipp only that the substance involved reports of several "contentious verbal altercations" between Kipp and students, support staff, and professional staff on school grounds between 2013 and 2018. *Id*. at 24-26.

At a May 31, 2018, meeting with Simpson, which was not a formal *Loudermill*[3] hearing, Kipp was given a three-day unpaid suspension. Fifth Amended Complaint at 26-27. Kipp believed Simpson was using the harassment policy selectively and more severely on her than in instances involving other teachers. *Id*. at 33. She filed a responsive grievance, still feeling "in the dark" because Simpson would not tell her any specifics about the allegations against her. *Id*. at 34. Kipp requested a Board hearing on her grievance, which was held on August 14, 2018; she was told she could not bring a lawyer or witnesses on her behalf. *Id*. at 35-36. Her grievance was denied by the Board in December 2018 and escalated to the arbitration stage. *Id*. at 39-40. Her suspension was ultimately reduced to two days, which she served "against her wishes" in January 2019. *Id*. at 46. In light of the length of time since May 2018 and her belief that she was being "set up" by Appellees, Kipp filed a second grievance in January 2019. *Id*. at 48-49.

On February 21, 2019, at an after-school teacher's union meeting, union president Sharp confronted Kipp in what Kipp describes as a premeditated "ambush"

---

[3] A *Loudermill* hearing is a pre-termination hearing for a public employee that is required by due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

to "create hostility" and embarrass her before the other teachers, including Mussett and Harris, who had joined Downs's harassment complaint against her. Fifth Amended Complaint at 49-52. Sharp also asked Kipp in an accusatory tone if she had a role in some Right-to-Know Law (RTKL)[4] requests that had been made by an unnamed individual regarding Kipp's relationship with the District and several Appellees. *Id*.

The next day, Sharp appeared at Kipp's classroom towards the end of the school day with other union members and a school police officer, which Kipp believed was intended to intimidate her. *Id*. at 53-54. It is not clear what transpired at that meeting; however, on February 25th, Kipp was told by her principal to report to Superintendent Saylor's office with her personal belongings. *Id*. at 56. Saylor told Kipp she was being placed on immediate suspension with pay for "at least a few days" while the District investigated whether she violated District privacy policies by putting documents that included the names of those who filed the harassment complaints against her on view in the teachers' lounge. *Id*. at 57-58.

Kipp believed the suspensions were conspiratorial, premeditated, and ordered by the Board in a private meeting in violation of the Sunshine Act, 65 Pa.C.S. §§ 701-716. Fifth Amended Complaint at 59. On March 4th, she emailed the Board and Saylor with her suspicions. *Id.* She ultimately reported the Board's purported Sunshine Act violations to the district attorney's office; the Fifth Amended Complaint does not indicate the result of that communication. *Id*. at 99. Kipp sent another email regarding her situation to some other union members on March 6th. *Id*. at 59. On March 11th, Saylor sent Kipp a letter warning her against contacting any union members involved in the investigative process in her case. *Id*.

---

[4] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

at 59. Kipp believed that Appellees were trying to silence her and isolate her from the union in violation of her First Amendment rights of free speech and association. *Id*. at 59-60.

On March 13th, Kipp received a letter from Saylor advising her that a *Loudermill* hearing was set for March 20th. Fifth Amended Complaint at 60. The hearing would concern several issues including the harassment complaint against her, whether she retaliated against the complainants, concerns over her relationship with her student teacher, and whether she violated confidentiality by putting confidential information regarding the complaint and investigation in the teachers' lounge. *Id*. at 60-61. She believed all of this was to cover up the District's initial error in allowing teachers to give students snacks during PSSA testing. *Id*. at 61-62. It appears that this hearing was rescheduled to April 18th. *Id*. at 69.

On March 14th, Kipp received an email that her local union had voted to remove her from her committee assignments on Sharp's motion. Fifth Amended Complaint at 63-64. She asked why she was excluded from that meeting but got no response. *Id*. at 64. She reported the issue to state union authorities, and the matter was set for another vote on April 25, 2019. *Id*. at 64-65. She was given only five minutes to speak by telephone at that meeting because she was not allowed on school property during her suspension; she was not permitted to ask any questions of the local union leadership. *Id*. at 65. The second vote also resulted in her removal from her committee assignments. *Id*. at 66.

Kipp avers that at the April 18th *Loudermill* hearing, District counsel provided no evidence to support the charges against her; instead, he asked her questions about her relationship with the union that she believed were "off limits" and violated her association rights. Fifth Amended Complaint at 70. On April 23rd,

5

Saylor told Kipp that she was recommending Kipp be terminated for retaliating against the harassment complainants. *Id*. at 71. Saylor refused to provide Kipp with more information about the allegations against her. *Id*. That evening, at a public Board hearing at which Kipp was present, the Board announced that it would be filing a "statement of charges"[5] formally advising her of the reasons for termination. *Id*. at 72. On April 26th, Saylor told Kipp that the Board supported moving forward with termination and that she was indefinitely suspended without pay effective immediately. *Id*. at 73-74. Kipp filed another grievance. *Id*. at 75.

Kipp received the statement of charges in early May 2019. Fifth Amended Complaint at 75. The statement presented 11 charges including retaliating against the teachers who filed the harassment complaint and participated in its investigation, violating confidentiality policies by putting confidential investigation documents in the teacher's lounge,[6] violating an order to refrain from contacting her student teacher after being suspended in February 2019, violating confidentiality by allegedly having her husband contact her student teacher on her behalf, engaging in contact with multiple students and one parent that led to reports to the District, and creating a hostile environment at the school. Statement of Charges, May 9, 2019; Exh. 37 to Kipp's Second Amended Complaint.[7] The statement gave Kipp the

[5] A "statement of charges" is part of the *Loudermill* termination process and is intended to give the employee sufficient notice of the proposed reasons for termination prior to the hearing. *See Vladimirsky v. Sch. Dist. of Phila.*, 144 A.3d 986, 1000 (Pa. Cmwlth. 2016).

[6] The statement of charges explained that although Kipp denied putting the reports in the lounge, only a few individuals had the reports and the documents in the lounge had markings and notes on them that Kipp acknowledged were hers. Statement of Charges at 4.

[7] It is settled that "[a]n amended complaint has the effect of eliminating the prior complaint" and that claims or even legal theories that are not reiterated in the amended complaint will be "lost" to the plaintiff. *Hionis v. Concord Twp.*, 973 A.2d 1030, 1036 (Pa. Cmwlth. 2009).

6

option of a hearing or arbitration. *Id*. She chose arbitration and filed another grievance. *Id*.

Kipp alleged that later in May, due to emotional distress, she developed physical ailments including grinding her teeth so severely that she broke a tooth and then developed an infected jawbone. Fifth Amended Complaint at 82. Her colleagues and other union members ostracized her. *Id*. at 83. The Fifth Amended Complaint's averments of fact end there, with Kipp suspended and her various grievances proceeding through arbitration.

---

It is less clear, however, whether the exhibits to a prior complaint, which remain part of the certified record, are similarly negated. *See* Pa.R.A.P. 1921 (stating that "original papers and exhibits filed in the lower court . . . shall constitute the record on appeal"). This Court has explained that "[d]ocuments, the contents of which are alleged in [a] Complaint and which no party questions, but which are not physically attached to the pleading, may be considered on [a] motion to dismiss for failure to state a claim." *Feldman v. Hoffman*, 107 A.3d 821, 836 (Pa. Cmwlth. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993)). This is particularly so when the documents in question "form[] in part the foundation" of the plaintiff's suit even if they are not attached or specifically incorporated into the pleading as permitted by Rule of Civil Procedure 1019(g). *Id*.; *see also* Pa.R.Civ.P. 1019(g).

Here, Kipp's Fifth Amended Complaint did not physically attach or expressly incorporate by reference the exhibits to her prior complaints, including the District Appellees' statement of charges. However, this document is part of the certified record, is the only one of its kind, and no party to this action questions its existence. Kipp discussed it substantively in the Fifth Amended Complaint. It constituted, at least in part, the "foundation of her suit" because it formally set forth Appellees' reasons for suspending her without pay and moving to terminate her, which led directly to her commencing this action against them. Fifth Amended Complaint at 75, 94. Lastly, both Appellees stated in their preliminary objections to the Fifth Amended Complaint that Kipp failed to state a claim for any of her allegations, which comports with the above-quoted statement from *Feldman*. *See* District Appellees' Preliminary Objections to Fifth Amended Complaint at 4-11; Sharp's Preliminary Objections to the Fifth Amended Complaint at 12-22. As such, the District Appellees' statement of charges may be considered in our consideration below of whether the trial court correctly determined that Kipp's Fifth Amended Complaint failed to state a claim upon which relief could be granted.

7

After filing her original complaint in January 2020, Kipp proceeded to file multiple amended complaints, often without the trial court's permission or Appellees' consent. Trial Ct. Op., June 23, 2023, at 4. In February 2020, she sought recusal of the first assigned trial court judge and removal of Sharp's counsel due to a purported conflict of interest with his role as union counsel. *Id*. The Board moved to seal some of Kipp's exhibits on the basis that they revealed confidential information, including the names of students and parents who reported issues with her, and needed to be sealed to protect the complainants from retaliation. *Id*. at 4. Appellees filed preliminary objections to some of Kipp's complaints, but it was often unclear which was the controlling complaint. *Id*. at 5.

On June 19, 2020, after a hearing, the first judge issued an order denying Kipp's motions for recusal and removal of Sharp's counsel, partially granting the Board's motion to seal, and deeming the most recently filed complaint, to which Appellees had filed preliminary objections, the operative pleading in the matter. Trial Ct. Op., June 23, 2023, at 9. Kipp appealed that order to this Court, which quashed the appeal in a *per curiam* memorandum and order because the trial court's order was interlocutory. *See Kipp v. Bellefonte Area Sch. Dist.* (Pa. Cmwlth. No. 938 C.D. 2020, filed Oct. 5, 2021) (unreported). The first judge subsequently recused herself to negate the appearance of impropriety. Trial Ct. Op., June 23, 2023, at 9.

After a September 2020 hearing on Appellees' preliminary objections, the trial court issued a January 15, 2021, opinion. Trial Ct. Op., Jan. 15, 2021. The court determined that Kipp violated Rule of Civil Procedure 1033(a), Pa.R.Civ.P. 1033(a), by failing to obtain either the court's permission or Appellees' consent to amend her complaints; that Kipp failed to exhaust her administrative remedies by

8

waiting for completion of the various arbitration proceedings on her grievances before filing suit; that the Board, Superintendent Saylor, and HR Director Simpson had high public official immunity against Kipp's state-law based claims sounding in defamation, civil conspiracy, and intentional infliction of emotional distress (IIED); that Kipp failed to state a case against teachers Downs, Harris, and Mussett for defamation, civil conspiracy, or IIED; and that Kipp failed to state a case for her Section 1983[8] due process and First Amendment civil rights claims against all Appellees. *Id*. at 4-18. The court dismissed Kipp's complaint but did so without prejudice and granted Kipp 30 days to file a revised complaint in compliance with the rules and with substantive legal sufficiency. *Id*. at 20.

In February 2021, Kipp filed two duplicative amended complaints. Trial Ct. Op., June 23, 2023, at 13. Kipp also filed four duplicative appeals of the trial court's January 2021 order, which were quashed by this Court as interlocutory in light of Kipp's February 2021 amended complaint. *See Kipp v. Bellefonte Area Sch. Dist.* (Pa. Cmwlth. No. 475 C.D. 2021, filed Sept. 20, 2021) (unreported). In August 2022, Kipp filed yet another amended complaint without the court's permission or Appellees' consent. Trial Ct. Op., June 23, 2023, at 15. Later that month, the trial court again permitted Kipp to file another complaint with the proviso that if that complaint failed to comply with the rules of civil procedure, her case would be dismissed with prejudice. *Id*. at 16. In October 2022, Kipp filed what would be her final amended complaint; this was her eighth filed complaint but is referred to as her Fifth Amended Complaint. *Id*. at 17. Appellees filed preliminary objections. *Id*.

---

[8] Section 1983 allows individuals to sue persons acting under color of state law for deprivation of federally protected constitutional rights. *See* 42 U.S.C. § 1983.

9

After a hearing, the trial court issued a December 19, 2022, order sustaining Appellees' preliminary objections and dismissing Kipp's Fifth Amended Complaint with prejudice. Trial Ct. Order, Dec. 19, 2022. The court noted that it had given Kipp "numerous opportunities" to file an acceptable and legally sufficient complaint, but the Fifth Amended Complaint still failed to conform with "a number of" local filing and civil procedure rules including Civil Procedure Rule 1019(a)'s directive that material facts be stated "in a concise and summary form." *Id.* at 1. The court added that the Fifth Amended Complaint, being filed in a compressed form with four pages on a single page with small font was "practically unreadable." *Id.* at 2. To the extent the Fifth Amended Complaint could be read, it lacked "any substantive changes in the factual allegations" from those in Kipp's previously dismissed complaints. *Id.* The court stated that further amendment would not only be futile but prejudicial to Appellees after three years of litigation during which Kipp failed to produce a viable complaint. *Id.*

In its subsequent opinion, the court relied on the December 2022 order and its January 2021 opinion on the merits of Appellees' preliminary objections to one of Kipp's prior complaints. Trial Ct. Op., June 23, 2023, at 20-21. The first judge also wrote an opinion in support of her June 2020 decision to seal certain exhibits from Kipp's complaints. Ruest Opinion, June 23, 2023, at 7. Kipp timely appealed to this Court and this matter is now ripe for disposition.

## II. Issues

Kipp appeals the first trial judge's June 19, 2020, order granting the Board's motion to seal certain exhibits to Kipp's then-current complaint; as noted, this Court quashed Kipp's previous appeal of that order because it was interlocutory

at that time. Kipp also appeals the current trial judge's December 19, 2022, order sustaining Appellees' preliminary objections and dismissing with prejudice Kipp's Fifth Amended Complaint, which alleged Section 1983 procedural due process violations, Section 1983 First Amendment violations, defamation and reputational rights violations, IIED, and malicious prosecution.[9]

## III. Discussion
## A. Trial Court Order Sealing Exhibits

A request to seal or unseal judicial records "is a matter committed to the discretion of the court whose records are at issue." *Milton Hershey Sch. v. Pa. Hum. Rels. Comm'n*, 226 A.3d 117, 127 (Pa. Cmwlth. 2020). The party seeking to seal a record must show "that [the] interest in secrecy outweighs the presumption of openness." *Id*. at 128. "Where the presumption of openness attached to a public judicial document is outweighed by circumstances warranting closure of the document to public inspection, access to the document may be denied." *Id*. Thus, judicial records may be sealed to protect "the privacy rights of individuals," including non-parties, although the reasons for nondisclosure must exceed "general concerns for harassment or invasion of privacy." *Id*. at 127.

---

[9] Kipp's malicious prosecution assertions are limited to three paragraphs in her Fifth Amended Complaint that generally reiterate her position that the harassment charges brought against her were baseless. Fifth Amended Complaint at 105-06. As a matter of law, malicious prosecution in the civil context requires that the proceedings underlying the claim "have terminated in favor of the person against whom they are brought." 42 Pa.C.S. § 8351(a)(2). There is no evidence in the record and Kipp has not asserted that any of the charges against her have been resolved in her favor. Moreover, she failed to develop a malicious prosecution argument in either her principal or reply brief. As such, this issue is waived. *See Gun Owners of Am., Inc. v. City of Phila.*, 311 A.3d 72, 85 (Pa. Cmwlth. 2024) (stating that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

Section 7.0(A)(5) of the Case Records Public Access Policy adopted by Pennsylvania Unified Judicial System (UJS) bars inclusion of a minor's name on any document filed with a court unless the minor is a criminal defendant and the information is filed on a contemporaneous confidential information form. *See* http://www.pacourts.us/public-records/public-records-policies (last visited October 6, 2025). Section 7.0(F) states that if a filed document does not comply with the foregoing rules, the court may seal it. *Id*.

Here, the Board moved in February 2020 for the trial court to seal multiple exhibits to Kipp's then-current complaint. After argument, the first trial judge granted the Board's motion in part. Trial Ct. Order, June 19, 2020. The order sealed one exhibit because it included a minor student's full name. *Id*. The order also sealed exhibits containing the District's confidential investigation reports, which contained personal information that could be used to retaliate against the complainants and other involved individuals. *Id*.

Kipp does not assert that she complied with the UJS public access policy's requirements. She argues generally that the trial court's sealing of some of her complaint exhibits "gives the impression that she did something wrong." Kipp Br. at 29. She asks this Court to reverse the trial court's order so the public can see that the "petty allegations" lodged against her do not amount to the unlawful harassment of which she has been accused. *Id*. at 55. The Board responds that the UJS expressly bars unredacted publication of a minor's name and that given the nature of Kipp's dispute with Appellees, including the three named teacher defendants, sealing the confidential reports to prevent retaliation based on publication of their personal information was proper. District Appellees Br. at 10-12.

We agree with the Board. First, the judge's order did not wholly grant the Board's motion, which sought to seal over 30 of Kipp's exhibits. The order limited its scope to the sole document that fully named a minor student; this comported with the UJS public access policy and also with the District's policy for harassment complaints.[10] With regard to the confidential investigative reports, which revealed complainants' home addresses and phone numbers as well as the names of non-parties involved in the investigation, the order reflects a determination that any public interest in these proceedings is outweighed by the interests of those individuals in their privacy, including their concerns regarding potential retaliation. That determination was well within the first trial judge's discretion and is affirmed.[11]

## B. Compliance of Fifth Amended Complaint with Rules of Civil Procedure

Rule of Civil Procedure 1019(a) states that in a complaint, the material facts on which the cause of action is based "shall be stated in a concise and summary form." Pa.R.Civ.P. 1019(a). This Court has held that "[i]f a complaint cannot be read, it does not state a cause at all, let alone in a concise and summary form. The purpose of this rule is to require the plaintiff to disclose the material facts sufficient

---

[10] *See* https://go.boarddocs.com/pa/bellasd/Board.nsf/Public?open&id=policies# (last visited October 6, 2025) (stating that "the privacy of the charging party and the person accused of the unlawful harassment shall be kept as confidential as possible, consistent with the district's legal obligations and the necessity to investigate allegations and to take disciplinary action"). We may take judicial notice of this policy as it is a publicly available record. *See In re F.B.*, 726 A.2d 361, 366 n.8 (Pa. 1999) (taking notice of school district policy on searches of student property).

[11] Relatedly, Appellee Sharp and the District Appellees filed in this Court separate motions to strike Kipp's reply brief on the basis that it was not responsive to Appellees' briefs and included appendices with extra-record allegations and evidence not of record or in Kipp's controlling Fifth Amended Complaint. Appellees' motions are granted such that any cumulative or non-record information in Kipp's reply brief and appendices has not been considered by this Court in our review of this appeal.

13

to enable the adverse party to prepare the case." *Bennett v. Beard*, 919 A.2d 365, 367 (Pa. Cmwlth. 2007).

Here, the trial court's December 19, 2022, order dismissed with prejudice Kipp's Fifth Amended Complaint partly because it "patently fails to conform to a number of the Rules of Civil Procedure . . . including but not limited to [Rule] 1019(a) for being practically unreadable due to being submitted as four (4) scanned pages printed to one (1) single page and for being 117 pages in length[.]" Trial Ct. Order, Dec. 19, 2022, at 2. The order stated that over the course of this litigation, Kipp "has had more than ample opportunity to comply with the [c]ourt's directives and the Pennsylvania Rules of Civil Procedure" yet has "consistently and repeatedly failed to cure the defects in her [c]omplaint[.]" *Id*. The District Appellees and Appellee Sharp largely echo the trial court's criticism. District Appellees' Br. at 35-37 & Sharp's Br. at 13. Kipp asserts that she "tried her best with uncertainty regarding what [the trial court] wanted her to fix" and that she "certainly did not mean to file [the Fifth Amended] Complaint as four (4) pages per sheet. Her view was only one page when she uploaded it." Kipp Br. at 47.

The trial court's frustration is perhaps understandable, given the court's direct experience with this litigation over several years, during which time Kipp has filed multiple amended and often prolix complaints, sometimes without the court's permission. However, Appellees have filed preliminary objections responding to the substantive allegations in Kipp's complaints, including the Fifth Amended Complaint, and Appellees' briefs to this Court include arguments addressing those allegations. This demonstrates that Appellees are able to discern the nature of Kipp's claims and prepare their cases accordingly. Moreover, this Court is also able, with the assistance of technology, to expand and read the Fifth Amended Complaint. As

14

such, the trial court's December 19, 2022, order is vacated to the extent it dismissed the Fifth Amended Complaint for failure to comply with procedural rules.

However, the trial court's order also stated that the Fifth Amended Complaint contains no discernible substantive changes from the factual allegations in Kipp's prior complaints, one of which the court dismissed without prejudice for legal insufficiencies in its January 2021 order and opinion addressing the substance and merits of Kipp's claims.[12] The trial court relied on that opinion in its June 2023 opinion in this appeal. Trial Ct. Op., June 23, 2023, at 21. Accordingly, we will address the merits of this appeal.

## C. Preliminary Objections

In ruling on preliminary objections, we accept as true all well-pleaded material allegations in the petition for review and any reasonable inferences that we may draw from the averments.[13] *Thomas v. Corbett*, 90 A.3d 789, 794 (Pa. Cmwlth. 2014). The Court, however, is not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the petition for review. *Id*. We may sustain preliminary objections only when the law makes clear that the petitioner cannot succeed on her claim, and we must resolve any doubt in favor of the petitioner. *Id*. "We review preliminary objections in the nature of a demurrer under the above guidelines and may sustain a

---

[12] Kipp's appeal of that order was quashed by this Court in light of the trial court's dismissal being without prejudice and Kipp's subsequent amendment of her complaint. *See Kipp v. Bellefonte Area Sch. Bd.* (Pa. Cmwlth. No. 475 C.D. 2021, filed Sept. 20, 2021 (unreported)).

[13] Where a court of common pleas dismisses a complaint based on preliminary objections, this Court's review is limited to determining whether the trial court committed an error of law or an abuse of discretion. *Minor v. Kraynak*, 155 A.3d 114, 121 (Pa. Cmwlth. 2017).

demurrer only when a petitioner has failed to state a claim for which relief may be granted." *Id*.

### 1. Section 1983/Procedural Due Process

To state a claim under Section 1983 for a deprivation of procedural due process rights, a petitioner must allege that: (1) he or she was deprived of an individual interest that is encompassed within the United States Constitution's Fourteenth Amendment protection of life, liberty, or property; and (2) the procedures available to him or her did not provide due process of law. *Todora v. Buskirk*, 96 A.3d 414, 420 (Pa. Cmwlth. 2014). In the context of public employees like teachers, the standard for procedural due process is set forth in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985):

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id*. at 546 (citations omitted).

Such employees are entitled to a "*Loudermill*" hearing prior to termination from their positions. *Veit v. N. Wales Borough*, 800 A.2d 391, 398 (Pa. Cmwlth. 2002). However, the United States Supreme Court has held that procedural due process requirements may be flexible depending on the circumstances and that a full prior hearing is not necessarily warranted prior to a suspension as opposed to

termination, as long as adequate due process is ultimately provided. *Id*. (citing *Gilbert v. Homar*, 520 U.S. 924 (1997)). This is the case whether the suspension is with or without pay. *See Burger v. Bd. of Sch. Dir. Of McGuffey Sch. Dist.*, 839 A.2d 1055, 1062 (Pa. 2003) (holding that a school board possesses implied authority to suspend a school superintendent accused of improper conduct on an interim basis, without pay and benefits, pending a termination hearing).

A tenured teacher will usually warrant a higher level of process than a school administrator. *Id*. at 1061 & n.10. Nonetheless, this Court has held that a teacher may be suspended without pay if charges against him or her constitute "serious misconduct," which is not specifically defined but may include a physical altercation, use of profane language, or other conduct that "foster[s] a toxic environment at school." *Sweda v. Upper Bucks Cnty. Tech. Sch.* (Pa. Cmwlth. No. 282 C.D. 2023, filed May 20, 2024), slip op. at 22-24, 2024 WL 2264720, at **10-11 (unreported).[14]

In its January 2021 opinion, the trial court pointed out that although Kipp did not receive a pre-termination *Loudermill* hearing until April 2019, her own recitation of the facts reflected multiple instances of prior due process provided by the District Appellees in association with her suspensions, including multiple meetings and written communications including notices and summaries of the harassment complaints against her and proposed disciplinary measures. Trial Ct. Op., Jan. 15, 2021, at 16. As such, the trial court concluded Kipp had not presented a legally sufficient claim of procedural due process violations. *Id*.

---

[14] This Court's unreported memorandum opinions may be cited for their persuasive value. *See* Section 414 of the Commonwealth Court's Internal Operating Procedures. 69 Pa. Code § 69.414.

Kipp acknowledges that her procedural due process allegations in her Fifth Amended Complaint "contain the same facts" as her previous complaints "except with more specific details about each Appellee." Kipp Br. at 34. She maintains that the trial court erred in finding that those allegations failed to sufficiently state a cause of action. *Id*. at 29-34. The District Appellees support the trial court's analysis and determination. District Appellees Br. at 19-22.

Kipp's Fifth Amended Complaint stated that prior to her first suspension, HR Director Simpson advised her of the harassment charges against her at a May 2, 2018, meeting where a union representative was also present. Fifth Amended Complaint at 24. Kipp was told that the complaints against her were formal and, therefore, many details had to remain confidential in compliance with District policy. *Id*. at 24-25. Simpson emailed Kipp the next day that the complaints pertained to multiple "contentious verbal altercations" involving Kipp between 2013 and 2018. *Id*. at 25.

The Fifth Amended Complaint added that on May 31, 2018, Simpson met with Kipp and a second union representative; she handed Kipp a document stating that after investigating, she concluded that Kipp's conduct violated District harassment policies, that Superintendent Saylor agreed, and that Kipp would be suspended for three days without pay. Fifth Amended Complaint at 26-27. After Kipp filed a grievance regarding the suspension, a non-*Loudermill* hearing was held before the Board in August 2018. *Id*. at 35. Although Kipp asserted that the hearing was flawed because she was not permitted to bring her personal attorney or character witnesses, she acknowledged that she was given 20 minutes to speak on her own behalf. *Id*. at 36-37. Her grievance was ultimately denied by the Board and escalated to the arbitration stage. *Id*. at 39. Then, at a January 2019 meeting with Saylor and

a union representative, Kipp was told that her suspension was reduced from three days to two days. *Id*. at 44. She served the suspension the next week and filed a grievance about it. *Id*. at 46-48.

Kipp's Fifth Amended Complaint next alleged the following facts leading to her second suspension. On February 21, 2019, Appellee Sharp confronted her in a hostile manner at an after-school union meeting and asked her about RTKL requests made by an unnamed individual regarding Kipp's relationship with the District and several of the Appellees. Fifth Amended Complaint at 49-50. The next day, copies of the confidential harassment complaints against her, including the names of the complainants, were placed visibly in the teacher's lounge. *Id*. at 54 & 58. After school, Sharp again confronted Kipp, with other union members present. *Id*. at 53-54. The next Monday, Kipp was told by her principal to report to Superintendent Saylor's office and bring her personal belongings. *Id*. at 56. Saylor told her that she was being placed on immediate paid suspension while the incidents were investigated. *Id*. at 57. While suspended, Kipp sent emails to the Board, Saylor, and to some union members stating that she was going to report the Board for making decisions about her situation out of the public eye and in violation of the Sunshine Act. *Id*. at 59.

Kipp received a *Loudermill* hearing notice indicating that the subject matter was her alleged retaliation against individuals involved in the harassment complaints against her and whether she put the documents with the complainants' names in the teachers' lounge in violation of privacy policies. Fifth Amended Complaint at 59-61. Kipp expressed criticisms about the April 2019 hearing, including assertions that the attorneys for the District and the teachers' union joined

19

forces against her and that she still had not been told who lodged the harassment complaints against her. *Id*.

Days later, on April 23ʳᵈ, Saylor met with Kipp and HR director Simpson and announced that she was recommending to the Board that Kipp be terminated for retaliating against the individuals involved in the harassment complaints against her. Fifth Amended Complaint at 71. That evening, the Board held a public hearing, which Kipp attended, and announced that it would be filing a "statement of charges" formally advising her of its reasons. *Id*. at 72. Days later, Saylor told Kipp that the Board had approved Saylor's recommendation to terminate Kipp and that she was now indefinitely suspended without pay. *Id*. at 73-74 & 77.

Kipp received the statement of charges shortly thereafter. Fifth Amended Complaint at 75. The statement gave her the option of a hearing or arbitration. *Id*. She chose arbitration and filed another grievance. *Id*.

Our review of Kipp's alleged facts supports the trial court's conclusion that she failed to state a claim that she did not receive adequate due process. Prior to her first three-day unpaid suspension, two meetings with HR Director Simpson and union representation were held and an email was sent by Simpson explaining the charges within the limitations of the District's privacy policy. When Kipp grieved the first suspension prior to serving it, a Board hearing was held at which she had 20 minutes to speak. After the grievance was denied, it proceeded to the arbitration stage. The suspension was ultimately reduced to two days, which Kipp served before filing a second grievance.

Although Kipp did not receive a full *Loudermill* hearing prior to her first suspension, such hearings are generally associated with termination or indefinite suspensions. *See, e.g., Ray v. Brookville Area Sch. Dist.*, 19 A.3d 29, 31

20

(Pa. Cmwlth. 2011). A suspension for a limited and short period of time will generally not warrant a *Loudermill* hearing. *See N. Allegheny Sch. Dist. v. N. Allegheny Fed'n of Teachers* (No. 1379 C.D. 2019, filed Nov. 9, 2020), slip op. at 2 & n.1, 2020 WL 6555152, at *1 & n.1 (unreported) (noting that teacher's initial misconduct led to one-day suspension without *Loudermill* hearing, which was ultimately held after additional incidents and prior to suspension without pay and termination). As such, the trial court properly concluded that Kipp's initial suspension did not warrant a full *Loudermill* hearing and that the communications and two meetings she received were adequate procedural due process.

The record shows that Kipp's next suspension in February 2019 was indefinite but paid pending investigation of the two encounters with Sharp. A *Loudermill* hearing was held in April 2019, after which Saylor recommended dismissal to the Board, which agreed in a public hearing and filed a statement of charges in accordance with *Loudermill*, after which Kipp was indefinitely suspended without pay while the matter went to arbitration. Although Kipp expresses multiple personal criticisms of the process she received, her factual allegations do not reflect that she was denied any formal aspect of process in 2019. The District and Board had to comply with confidentiality policies regarding the harassment complaints. However, given Kipp's naming of the complainants in her lawsuit, she was never truly "in the dark" about the reasons she was subjected to discipline, nor was she denied opportunities to speak on her own behalf within the established rules of the various meetings and hearings that were held.

Moreover, the statement of charges ultimately issued by the Board in May 2019 and attached as an exhibit to Kipp's Fifth Amended Complaint reflects its conclusion that Kipp's return to the school after her February 2019 suspension

21

would worsen the hostile environment her presence had already created since late 2018 and that her actions to that point constituted the kind of "serious misconduct" that this Court discussed in *Sweda* as warranting an unpaid suspension without further process, particularly in anticipation of termination. Accordingly, we find the trial court did not err or abuse its discretion in sustaining the District Appellees' preliminary objections in this regard.[15]

Regarding Kipp's allegations within her Section 1983 procedural due process claim that the Board engaged in decisions regarding her case in private sessions in violation of the Sunshine Act, the trial court noted correctly that such challenges "shall be filed within 30 days from the date of a meeting which is open, or within 30 days from the discovery of any action that occurred at a meeting which was not open at which this chapter was violated[.]" 65 Pa.C.S. § 713. Further, "in the case of a meeting which was not open, no legal challenge may be commenced more than one year from the date of said meeting." *Id*. Kipp's Fifth Amended Complaint alleges that the Board made improper "behind the scenes" decisions when it approved her initial three-day suspension in May 2018; suspended her indefinitely with pay in February 2019 prior to the announcement at its public hearing on April 23, 2019, that a statement of charges would be filed; and suspended her indefinitely without pay as of April 26, 2019. Fifth Amended Complaint at 41.

Kipp's original complaint was filed in January 2020. Pursuant to the second quoted phrase from Section 713 of the Sunshine Act, the time to file a

---

[15] Appellee Sharp argues separately that as a teacher and union official sued in her individual capacity, she cannot be liable for any procedural due process violations because she held no authority under state law to provide, much less deprive Kipp of procedural due process, nor did Kipp's Fifth Amended Complaint allege any facts to that effect. Upon review of the Fifth Amended Complaint, we agree. Kipp asserted only that Sharp instigated two hostile encounters with Kipp prior to her suspension in February 2019, not that Sharp had any role in communicating or scheduling meetings or hearings related to Kipp's disciplinary proceedings.

challenge to any Board action taken in a non-open meeting prior to January 2019 had expired by then. Accordingly, the time for Kipp to challenge any allegedly improper actions taken by the Board prior to its May 2018 imposition of Kipp's initial three-day suspension had elapsed by the time she filed her first complaint.

Similarly, Kipp alleges that she believed her February 2019 and April 2019 suspensions violated the Sunshine Act as soon as they took effect and that, in fact, after she was suspended in February 2019, she reported a suspected violation to the district attorney in March 2019. Kipp does not assert that the district attorney took any action on the report. The consequence is that under the Sunshine Act's version of the discovery rule, Kipp had to formally bring her personal or private "legal challenge" against the Board (as opposed to merely reporting it to the district attorney) no later than March 2019 for the February 2019 suspension or May 2019 for the April 2019 suspension. Although her inclusion of her allegations in her January 2020 complaint occurred within a year of the purported violations, they were still untimely, and the trial court did not err in sustaining the District Appellees' preliminary objections in this regard.

## 2. Section 1983/First Amendment

To prevail on a First Amendment retaliation claim, the plaintiff must show "(1) that the activity at issue was in fact protected; and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Todora v. Buskirk*, 96 A.3d 414, 417 (Pa. Cmwlth. 2014). Whether speech is constitutionally protected is a question of law for the court. *Id*. When a public employee claims that her employer retaliated for First Amendment activity, the employee must establish that the speech related to a matter of public concern. *Id*. Speech implicates a "public

concern" if its content or context addresses a matter of political, social, or other area of interest to the community. *Id*. This contrasts with speech on matters that are purely personal or private to the employee, whose motive in speaking is "important, but not dispositive." *Id*.

A governmental employer may exercise a certain degree of control over a public employee's speech and may take disciplinary measures if the speech causes or is likely to cause disruption of the entity's operations. *Carr v. Dep't of Transp.*, 230 A.3d 1075, 1087-90 (Pa. 2020). A reviewing court must balance the public employee's interest "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968)).

A governmental employer may also defeat a retaliation claim by "demonstrating that the same adverse action would have taken place in the absence of the allegedly protected conduct." *Todora*, 96 A.3d at 417. There, a corrections officer alleged that after he filed a lawsuit against county defendants asserting exposure to toxic mold while working, he was unfairly disciplined in retaliation. 96 A.3d at 416. This Court examined federal case law distinguishing between matters of genuine public concern, such as racial discrimination and allegations of local governments providing poor public services, and speech related to personal dissatisfactions or "mundane employment grievances." We deduced that when a public employee speaks "as an employee upon matters only of personal interest, absent the most unusual circumstances, a court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id*. at 419. This Court agreed with the trial

court that the officer's lawsuit did not seek "injunctive relief to protect the safety of the public"; rather it was primarily "about conditions of employment" and "a personal injury action to recover money damages." *Id*. As such, the lawsuit was not protected speech. *Id*. Moreover, the record contained other reasons for the employer's discipline such that the officer had not established that his lawsuit was a substantial factor in that action. *Id*. at 419-20.[16]

In its January 2021 merits opinion, the trial court stated that Kipp's actions in contacting the complainants and others involved in the harassment complaints against her were not constitutionally protected conduct and that Saylor's warning to Kipp that her conduct violated District confidentiality policies and could lead to her termination did not amount to retaliatory action. Trial Ct. Op., Jan. 15, 2021, at 17. *Id*. In her brief, Kipp reiterates the arguments from her Fifth Amended Complaint while the District Appellees echo the trial court's conclusions. Kipp Br. at 33 & 48-49; District Appellees Br. at 25-29.

Although the trial court did not directly address Kipp's allegation that the harassment complaints against her were retaliation for her threats to report the PSSA snacks issue or her reporting the District and Board for their alleged mistreatment of her, we can address these issues through a review of her Fifth Amended Complaint. Regarding the PSSA snacks issue, Kipp did not allege that she reported the issue publicly or even to the school community. She stated only that she raised her concerns with the school principal and that this led to a concerted

---

[16] Our First Amendment retaliation cases share similarities with cases like *Javitz v. Luzerne County*, 293 A.3d 570 (Pa. 2023), which involved a public employee who was terminated after she reported suspicions that another public employee violated the Wiretap Act by secretly recording an investigatory hearing. In that litigation, our Supreme Court vacated a prior determination by this Court and remanded to this Court for further proceedings. Despite the similarities, which our Supreme Court pointed out, *Javitz* is in our courts on state whistleblower law issues, not First Amendment issues, making it inapposite here. *See id*. at 585 n.20.

25

effort by Saylor, Simpson, and the Board to manufacture other teachers' complaints against Kipp to "silence her" from reporting the alleged violations to state testing authorities. *See* Fifth Amended Complaint at 32-33 & 99. We acknowledge that PSSA testing violations involving improper provision of snacks could pose a public concern and to the extent that Kipp expressed an intent to report the matter, her speech implicated First Amendment concerns. However, as will be addressed below, the District's statement of charges setting forth its basis for disciplining Kipp, which she included as an exhibit to the Fifth Amended Complaint, demonstrated "that the same adverse action would have taken place in the absence of the allegedly protected conduct." *Todora*, 96 A.3d at 417.

Regarding Kipp's attempts to personally contact the complainants and other individuals involved in the investigations, she averred that she emailed "some" other teachers on March 6, 2019, "about her employment situation" in a way that "did not contain anything improper." Fifth Amended Complaint at 59. She asserted that she did this to reach out to them as fellow union members for assistance in her distress over being suspended and that her email was protected by her free speech and association rights. *Id*. at 60. Unlike the PSSA snacks issue, Kipp's interest in her ongoing employment dispute with Appellees sounds in the kind of personal employment issues that have been found ineligible for protection since they do not raise or implicate a public concern. *Todora*, 96 A.3d at 418-19.

Kipp next alleges that in January and March 2019 she reported to the district attorney's office that the District violated the Sunshine Act by discussing her case and deciding to suspend her in its executive session away from a public hearing. Fifth Amended Complaint at 99. As noted, a public employee's report of alleged governmental misconduct to authorities may constitute protected speech as well as

26

a valid public concern. *See Carr*, 230 A.3d at 155-56. Although the officer in *Todora* filed a personal injury lawsuit and did not, like Kipp, report an alleged Sunshine Act violation, we may consider her motive. *Todora*, 96 A.3d at 417. After reviewing Kipp's Fifth Amended Complaint, we conclude that her report to the district attorney's office alleging Sunshine Act violations was not intended to uncover systemic abuses by the Board and District, of which her case was but one, but to combat what she perceived as actions taken on her case.

Moreover, Kipp's Fifth Amended Complaint and exhibits undermine the legal sufficiency of her retaliation claims because they reveal that the Board and District had sufficient alternative reasons to suspend her and ultimately seek her termination even if she had not reported the alleged Sunshine Act violations. *See Todora*, 96 A.3d at 417. On May 3, 2018, HR Director Simpson advised Kipp that her reported and documented "contentious verbal altercations" with various individuals since 2013 were under review in light of her 2018 recent disputes over the PSSA snack issue. Fifth Amended Complaint at 25. Kipp was suspended for three days (later reduced to two days) without pay based on violations of harassment, privacy, and retaliation policies involving teachers, professional staff, and students. *Id*. at 26. Then, Kipp was involved in two incidents with Appellee Sharp and an email dispute with Appellee Downs during February 2019. *Id*. at 49-56.

Kipp attached as an exhibit to a prior complaint the District's statement of charges from May 2019, which was issued after her April 2019 *Loudermill* hearing and in association with the Board's announcement at the public Board

27

meeting several days later.[17] Exh. 37 to Kipp's Second Amended Complaint.[18] The statement recounted multiple unheeded warnings to Kipp to refrain from threats or improper contact with the harassment complainants and other individuals involved in the original investigations; stated that she breached confidentiality and sought to intimidate the complainants by placing investigation documents with their names and personal information in the teachers' lounge, which the Board attributed to Kipp because the documents contained handwritten notes that she admitted were hers; that she improperly tried to influence her student teacher regarding her disputes with Appellees, both before she was suspended in February 2019 and subsequent to her suspension after she had been told not to contact the student teacher; and that she attempted to evade the no-contact order by having her husband contact the student teacher and attempt to discuss confidential matters with her. The statement of charges also listed four documented complaints about Kipp from students and a parent beginning in September 2018; Kipp had received warnings about these incidents.

As such, we conclude that Kipp's own pleading indicates that her report to the district attorney's office asserting Sunshine Act violations by the Board was not protected speech and, even it had been, that it was not a substantial factor in the decision to suspend and then terminate Kipp. Accordingly, we find the trial court

---

[17] Courts reviewing preliminary objections may consider not only the facts pled in the complaint, but also any documents or exhibits attached to it. *Log Cabin Prop., LP v. Pa. Liquor Control Bd.*, 276 A.3d 862, 869 (Pa. Cmwlth. 2022).

[18] As discussed above in footnote 7, we may consider this exhibit to a prior complaint because it is part of the certified record, its existence is not questioned by any party, it is identified and substantively discussed in the Fifth Amended Complaint, and it forms part of the foundation of Kipp's lawsuit. *See Feldman*, 107 A.3d at 836.

did not err or abuse its discretion in sustaining the District Appellees' preliminary objections in this regard.[19]

### 3. Section 1983/Reputational Rights[20]

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Edinger v. Borough of Portland*, 119 A.3d 1111, 1114 (Pa. Cmwlth. 2015) (quoting *Wis. v. Constantineau*, 400 U.S. 433 (1971)). Reputation alone, however, is insufficient to implicate a constitutionally protected liberty interest. *Id*. (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006)). This type of claim is a subset of procedural due process implicating the Fourteenth Amendment to the United States Constitution. *Id*. at 1112. The plaintiff must satisfy the "stigma-plus" test by alleging or establishing that the employer created and publicly disseminated a false and defamatory impression about the plaintiff (the "stigma") in connection with actions subjecting the employee to suspension or termination of employment in which the employee has a property right, such as

---

[19] As with Kipp's procedural due process allegations, Appellee Sharp argues separately that she cannot be liable for any First Amendment violations because she held no authority under state law, nor did Kipp's Fifth Amended Complaint allege any facts to that effect. We agree. Kipp's Fifth Amended Complaint described Sharp as a teacher and president of the local teacher's union; she is not alleged to have held any government role or authority at the relevant time. Fifth Amended Complaint at 4.

[20] Kipp's Fifth Amended Complaint cites Article I, Section 1 of the Pennsylvania Constitution, which expressly protects reputational rights. Fifth Amended Complaint at 100 (quoting Pa. Const. Art. I, § 1). However, the arguments presented and cases cited in her brief are limited to reputational rights interests under the United States Constitution. As such, she has waived any claims based on the Pennsylvania Constitution. *See Gun Owners of Am.*, 311 A.3d at 85 (stating that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

29

tenure (the "plus"). *Hill*, 455 F.3d at 237-39. When such a deprivation occurs, the employee is entitled to a name-clearing hearing. *Id.* at 237. To satisfy the stigma prong of the test, a stigmatizing statement must (1) be made publicly and (2) be false. *Edinger*, 1119 A.3d at 1115. "[T]he allegedly stigmatizing statements must go beyond allegations of professional competence, improper or inadequate performance, dereliction or neglect of duty, or malfeasance; for example, statements that implicate the employee's honesty or "moral turpitude" could satisfy the test. *Id.* at 1115-16.

The trial court's rejection of Kipp's reputational claims is limited to the following: "[Kipp] contends injury to her reputation alone. However, [she] had sufficient opportunity to clear her name at both the *Loudermill* hearing and the Board hearing." Trial Ct. Op., Jan. 15, 2021, at 18. In her brief, Kipp asserts that "false claims" about her violations of the District's harassment policies were "disseminated by the Appellees and spoken or laughed about inappropriately." Kipp Br. at 48. She avers that Appellees' suspensions stigmatized her and deprived her of her property right in her tenured teaching position. *Id.*

The District Appellees respond that Kipp's Fifth Amended Complaint fails to allege that any Appellees made public statements concerning these matters until the April 2019 public Board meeting when the intent to issue a statement of charges was announced in accordance with the *Loudermill* process. District Appellees' Br. at 23-25. The District Appellees add that to that point, the only discipline Kipp had been subject to was the two-day unpaid suspension she served in January 2019 and the paid suspension imposed in February 2019 after the two encounters between Sharp and Kipp; as such, during the relevant period, Kipp was

not subject to the level of discipline that rose to the level of a "stigma-plus" violation, such as termination or suspension without pay. *Id*.

We agree with Appellees. Kipp's Fifth Amended Complaint alleges multiple incidents of "hostility and disrespectful behavior" from various Appellees, beginning after Kipp questioned giving snacks to students during PSSA testing. Fifth Amended Complaint at 13. Kipp also reports several instances where individuals allegedly spoke ill of her, but according to her own pleading, these statements were not made public either on social media or through other channels. *See id*. Read as a whole, the Fifth Amended Complaint implies that the totality of Appellees' actions against Kipp, including her suspensions, satisfied the "stigma plus" test. However, in the absence of specific allegations that statements were made against Kipp that were public, false, and went beyond criticism of her professional competence, her Fifth Amended Complaint fails to state a legally sufficient claim that Appellees have deprived her of her liberty interest in her reputation. Accordingly, we find the trial court did not err or abuse its discretion in sustaining the District Appellees' preliminary objections in this regard.[21]

## 4. State Law Tort Claims

## a. High Public Official Immunity

In Pennsylvania, the common law doctrine of high public official immunity "acts as an absolute bar to protect high public officials from lawsuits

---

[21] As with Kipp's procedural due process and First Amendment allegations, Appellee Sharp argues separately that she cannot be liable for any violations in this regard because she held no authority under state law, nor did Kipp's Fifth Amended Complaint allege any facts to that effect. We agree. Kipp's Fifth Amended Complaint described Sharp as a teacher and president of the local teachers' union and did not allege that she held any government role or authority at the relevant time. Fifth Amended Complaint at 4.

arising out of actions taken in the course of their official duties and within the scope of their authority." *Doe v. Franklin Cnty.*, 174 A.3d 593, 603 (Pa. 2017) (internal citations omitted). The purpose of high public official immunity is to shield the high public official from liability for the benefit of the public he or she serves. *Id*. Absolute immunity from civil liability for high public officials is a means of removing any inhibition which might otherwise "deprive the public of the best service of its officers and agencies." *Id*. The scope of high public official immunity is broad and "exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the . . . actions are taken in the course of the official's duties or powers and within the scope of his authority[.]" *Id*.

Whether an individual is a high public official for immunity purposes is addressed on a case-by-case basis, considering "the nature of [an official's] duties, the importance of [the] office and particularly whether or not [the official] has policy-making functions." *Doe*, 174 A.3d at 603 n.10. Although policymaking is a significant consideration, it is not dispositive, as this immunity "has in many instances been extended to a wide range of public officials whose policy-making roles were not salient." *Durham v. McElynn*, 772 A.2d 68, 70 (Pa. 2001) (concluding that assistant district attorneys are immune based on their roles in carrying out the functions of the district attorney's office). "Rather, it is the public interest in seeing that the official not be impeded in the performance of important duties that is pivotal." *Id*.

This Court has held that school board members qualify as high public officials due to their statutory duties under Section 5-510 of the School Code of 1949, which include the authority to "adopt and enforce such reasonable rules and

32

regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of all" employees and students. 24 P.S. § 5-510; *Matta v. Burton*, 721 A.2d 1164, 1166 (Pa. Cmwlth. 1998). We have also held that school superintendents may claim this immunity as long as the actions at issue are within the scope of their duties or powers. *Batgos v. Calloway* (Pa. Cmwlth. No. 1203 C.D. 2021, filed Mar. 15, 2024), slip op. at 12-14, 2024 WL 1131335, at **6-7 (unreported).

Here, the trial court concluded that the Board, Superintendent Saylor, and HR Director Simpson had high public immunity from Kipp's claims for defamation and intentional infliction of emotional distress in light of their various authorities and because they were acting within their duties during the relevant period. Trial Ct. Op., Jan. 15, 2021, at 10-11 & 14-15.

Kipp does not address the trial court's high public official immunity determination, arguing instead that the court wrongly granted the District Appellees governmental and qualified immunity as to her Section 1983 claims – forms of immunity that these Appellees have not claimed in response to Kipp's Fifth Amended Complaint.[22] Kipp Br. at 8, 25-26 & 29-33; District Appellees Preliminary

---

[22] Governmental immunity, which is codified at Sections 8541 and 8542 of the Judicial Code, 42 Pa.C.S. §§ 8541–8542, shields local agencies and governments from state law-based tort liability for damages caused by their actions or their employees' actions in the absence of specific and enumerated exceptions. *See Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1019 n.2 (Pa. Cmwlth. 2014). To the extent Kipp challenges the District's claim of governmental immunity, which the District raised in its preliminary objections, this Court has held that allegations of defamation are not among the causes of action that defeat governmental immunity. *Alston v. PW-Phila. Weekly*, 980 A.2d 215, 219 (Pa. Cmwlth. 2009).

Qualified immunity, which is codified at Section 8546 of the Judicial Code, 42 Pa.C.S. § 8546, shields individual government officials from personal liability for civil damages arising from actions taken within the scope of their official duties, provided those actions did not violate

Objections to Fifth Amended Complaint, Oct. 6, 2022. The District Appellees assert that Kipp's failure to contest the trial court's high public official immunity determination waived any argument against that conclusion. District Appellees Br. at 13. In the alternative, the District Appellees assert that Kipp has offered no new facts in her Fifth Amended Complaint that would require a different outcome from the trial court's previous immunity determinations. *Id*. at 13-17. Sharp, a teacher and president of the local teachers' union, does not claim any form of immunity. Sharp Br. at 7.

Procedurally, our courts have long recognized a limited exception to the rule against pleading affirmative defenses in preliminary objections and have allowed parties to plead the affirmative defense of immunity as in preliminary objections where the defense is clearly applicable on the face of the complaint. *Hommrich v. Boscola*, 329 A.3d 775, 780 (Pa. Cmwlth. 2025). Here, we may determine the question of immunity for the Board, Saylor, and Simpson from Kipp's Fifth Amended Complaint; accordingly, their assertion of this defense was not improper.

Kipp's Fifth Amended Complaint asserts that the Board members, Saylor, and Simpson defamed her by "informing her colleagues" and the school community that she violated the District's harassment policies when, in her estimation, they knew those complaints were based on unfounded "hearsay gossip." Fifth Amended Complaint at 101-02. She adds that these Appellees further defamed her by accusing her of violating the District's confidentiality policy and retaliating

---

clearly established statutory or federal constitutional rights. *Lancie v. Giles*, 572 A.2d 827, 829 (Pa. Cmwlth. 1990). In light of our conclusion above that Kipp's Section 1983 claims lack legal sufficiency, the question whether any of the individual Appellees may claim qualified immunity is moot.

against the complainants. *Id*. at 104. She alleges that the suspensions imposed upon her and the Board's public announcement after the *Loudermill* hearing that a statement of charges would be issued against her were part of the defamation on its part. *Id*. at 104-05. Kipp's Fifth Amended Complaint adds that the foregoing actions by these Appellees amounted to IIED. *Id*. at 106-09.

As noted in *Matta* and *Batgos*, school board members and school superintendents are entitled to high public official immunity when they act within the scope of their duties and authority. *Matta*, 721 A.2d at 1166; *Batgos*, slip op. at 12-14, 2024 WL 1131335, at **6-7. There is no express or implied allegation in the Fifth Amended Complaint that the Board members or Saylor acted outside of their official duties and authority in investigating the original harassment complaints and subsequent allegations of Kipp's retaliation against the complainants, suspending Kipp as a result of the investigation findings, and announcing the statement of charges, but not its contents, at a public hearing. As such, the trial court did not err in conferring high public official immunity upon the Board members and Saylor, which shielded them from trial and liability on Kipp's defamation and IIED claims.

Our case law has not yet addressed whether a school district's HR director is eligible for high public official immunity. However, "absent statutory classification, the parameters establishing 'high public official' status would be delineated by the judiciary on a case-by-case basis . . ." applying the factors described above. *Doe*, 174 A.3d at 603 n.10. Regarding Simpson, the trial court emphasized her role in addressing, investigating, and determining the viability of harassment complaints in determining that she was entitled to high public official immunity. Trial Ct. Op., Jan. 15, 2021, at 10.

35

In addressing this issue, we take judicial notice of the District's publicly available Unlawful Harassment policy. *See In re F.B.*, 726 A.2d 361, 366 n.8 (Pa. 1999) (taking notice of school district policy on searches of student property). The HR director investigates every harassment complaint that cannot be informally resolved and must produce a written report that includes any conclusion by the HR director that unlawful harassment has occurred "and a recommendation as to remediation if appropriate." District's Unlawful Harassment Policy at 3. The report is submitted to the superintendent, and if the HR director "concludes that unlawful harassment has occurred, the Superintendent shall recommend appropriate remediation and/or discipline up to and including dismissal." *Id*. "If the Director of Human Resources concludes that no unlawful harassment has occurred, the parties and the Superintendent shall be so notified." *Id*. at 4. The HR Director also addresses appeals if a complainant is unsatisfied with the initial finding. *Id*.

Simpson, as the District's HR Director, appears to have little policy-making authority in this context. In fact, the HR Director's duty is limited to publishing and disseminating the policy rather than creating it. District's Harassment Policy at 2. However, Simpson's role includes not only investigating complaints but also determining in the first instance whether harassment has occurred or not, and according to the policy, that determination is subject to only limited further review, if at all, by the superintendent. In effect, Simpson has discretion in this area that resembles the role of the assistant district attorneys found eligible for high public official immunity in *Durham*, not to mention a degree of quasi-judicial discretion and authority. Even in the absence of policy-making authority, this elevates Simpson's role, in this fact-specific and limited context, to one eligible for this immunity. As such, the trial court did not err in granting

36

Simpson high public official immunity, along with the Board and Saylor, with regard to Kipp's claims sounding in defamation and intentional infliction of emotional distress.

### b. Defamation: Appellees Downs, Harris, Mussett & Sharp

A complaint stating a cause of action for defamation must allege: (1) the defamatory character of the communication; (2) publication of the communication to a third party; (3) that the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury. *Feldman v. Lafayette Green Condo. Ass'n*, 806 A.2d 497, 500 (Pa. Cmwlth. 2002 (citing 42 Pa.C.S. § 8343). Whether a challenged statement is capable of defamatory meaning is a question of law and we view the statement in its factual context because the key in determining defamatory meaning is the effect the statement would produce on its intended audience. *Id*. A communication is considered defamatory if it tends to harm the reputation of another so as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. *Id*.

Generally, a statement that is merely an expression of the speaker's opinion and is based on "disclosed or assumed nondefamatory facts" is not defamatory. *Feldman*, 806 A.2d at 500. However, if an opinion is based on "undisclosed facts" of a defamatory nature, it may be actionable. *Id*. at 501. In *Feldman*, this Court provided an example of the distinction:

> *Goralski* [*v. Pizzimenti*, 540 A.2d 595 (Pa. Cmwlth. 1988)] is instructive. In *Goralski*, a substitute teacher claimed the school district's use of the term "misconduct" in her termination letter constituted defamation. This letter stated the teacher's frequent absences and abusive language toward another employee was "misconduct."

37

The teacher argued that use of the term "misconduct" was defamatory. We disagreed, holding that use of the term "misconduct," was merely an expression of opinion, supported by clearly disclosed facts concerning the teacher's absences and abusive language. Because the term "misconduct" was pure opinion, it was not capable of defamatory meaning and the case was properly dismissed.

*Id.*

Here, in light of the immunity of the Board, Superintendent Saylor, and HR Director Simpson, the remaining Appellees subject to Kipp's defamation claims are Downs, Mussett, and Harris, the teachers who lodged harassment complaints against her; and Sharp, a teacher and the local teachers' union president, who had several altercations with Kipp during the relevant period. The trial court concluded that Kipp's allegations failed to state with sufficient specificity the contents or context of these Appellees' purportedly defamatory statements, identify the direct audience of those statements, or sufficiently allege that the statements were "published" as required by the elements of defamation. Trial Ct. Op., Jan. 15, 2021, at 12. Kipp maintains that her allegations were sufficient. Kipp Br. at 42 & 46-48. The District Appellees and Sharp respond that the trial court correctly determined that Kipp's allegations lacked the required specificity to support her claim. District Appellees' Br. at 29-30; Sharp Br. at 20. We agree with the District Appellees and Sharp.

In her Fifth Amended Complaint, Kipp asserted that Mussett told school staff that he did not like her; spoke at a union meeting against Kipp's initial grievance being approved for arbitration after it was denied, because he believed she had harassed him, as well as Downs and Harris; and laughed at and mocked Kipp during the relevant period. Fifth Amended Complaint at 20 n.10, 49-50, 108. Kipp also asserted that Harris falsely told other union members that Kipp had harassed

her. *Id*. at 102. Kipp alleged that Downs had filed a false harassment complaint against her, told other teachers about it, and solicited them to join his complaint; and that he laughed at and mocked Kipp during the relevant period. *Id*. at 13, 18-19, 108.

Kipp also asserted that Sharp told other union members that she did not like Kipp and did not want to "deal with her" during union meetings; accused Kipp during a meeting of having something to do with RTKL requests made by an unnamed individual involving Kipp's employment issues that Sharp felt targeted the District during the relevant period; emailed all union members about the requests in a way that Kipp asserted was unnecessary and was intended to embarrass Kipp and make her look bad; and accused Kipp during two union meetings of breaking confidentiality by telling people who filed the harassment complaints against her. Fifth Amended Complaint at 21 n.11, 50-51, 54, 65 & 73. Kipp maintained that what these Appellees allegedly said about her to others in the school community was willful and malicious and "destroyed [her] reputation in the community she lives and teaches in." *Id*. at 105.

Upon review, Kipp's allegations do not sufficiently state a cause of action sounding in defamation against Mussett, Harris, Downs, or Sharp. Clearly, acrimony existed among these parties during the relevant period. However, the statements at issue are all either pure opinions or opinions based on disclosed or known facts as in *Goralski*. For example, Mussett's statement that he did not like Kipp and Sharp's statement during union meetings that she did not like Kipp and did not want to work with her were pure opinions. The statements made by Mussett, Harris, and Downs that Kipp harassed them and retaliated against them for filing complaints against her were opinions based on disclosed or known facts, specifically

39

that the complaints were made and resulted in the deterioration of these Appellees' relationships with Kipp. Similarly, Sharp's statements to union members regarding the RTKL requests were based on the fact that those requests were made, of which we take judicial notice as the resolution of those requests is a public record.[23] As none of the alleged statements made by these Appellees meets the legal definition of a defamatory communication, the trial court did not err or abuse its discretion in sustaining these Appellees' preliminary objections in this regard.

### c. Intentional Infliction of Emotional Distress

The elements of IIED are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another. *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Cmwlth. 2010). "[M]ere insults, indignities, threats, or annoyances" will not rise to the level of "extreme and outrageous conduct." *McNeal v. City of Easton*, 598 A.2d 638, 641 (Pa. Cmwlth. 1991) (quoting the Restatement (Second) of Torts § 46 (1965)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987) (quoting Restatement (Second) of Torts § 46 comment d (1965)). Instances where this tort has been established are relatively rare and comport with the standard set forth in *Kazatsky*. *See Hoy v.*

---

[23] *See In the Matter of Simon Campbell v. Bellefonte Area Sch. Dist.* (Off. of Open Recs., filed May 17, 2019), 2019 WL 2207893 (requesting, *inter alia*, all emails sent or received by HR Director Simpson to and from teachers, union personnel, and union counsel since October 10, 2017, relating to "(a) the workplace duties, expectations, behaviors or performance of Benner Elementary teacher Lynn Kipp, and/or (b) any complaint or other allegation of workplace wrongdoing made against Mrs. Kipp by any employee or representative of the . . . District").

*Angelone*, 720 A.2d 745, 754 (Pa. 1998) (collecting cases, including *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. Super. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party, which led to plaintiff being indicted for homicide)). A court has the authority to evaluate, on the basis of "outrageousness" and intent, whether a plaintiff can sustain a claim of intentional infliction of emotional distress. *McNeal*, 598 A.2d at 640.

Here, the trial court concluded that, as with Kipp's defamation claims, the Board, Superintendent Saylor, and HR Director Simpson were eligible for high public official immunity against Kipp's IIED claims. Trial Ct. Op., Jan. 15, 2021, at 14. Regarding Sharp, Downs, Mussett, and Harris, the trial court concluded that Kipp failed to "allege sufficient material facts" to support her claims in this regard because neither the individual actions and statements of these Appellees nor the collective effect of those actions and statements rose to the level of "extreme and outrageous conduct." *Id*. at 14-15. Kipp argues that the trial court erred in its evaluation of her allegations. Kipp Br. at 36-38. The individual Appellees support the trial court's determination that none of the conduct at issue rose to the level necessary to support Kipp's allegations. District Appellees Br. at 31; Sharp Br. at 21-22.

Kipp's IIED allegations, based on the same facts she asserted with regard to her defamation allegations, were that the collected statements and actions against her by the individual Appellees, including purportedly false allegations of harassment, retaliation, and turning other teachers and union members against her, were done with the intent to inflict "extreme" emotional distress. Fifth Amended Complaint at 106-09. Kipp maintains that these Appellees' actions resulted in loss of her income when she was ultimately suspended without pay, reduced her job

prospects, caused the loss of union support, and resulted in health issues and medical debt. *Id.* Kipp alleged that Appellees had knowingly "destroyed her life." *Id.* at 108.

For the same reasons discussed above about Kipp's defamation claims, we agree with the trial court that the Board, Saylor, and Simpson are immune from Kipp's IIED claims. *See* Trial Ct. Op., Jan. 15, 2021, at 14. Regarding the remaining Appellees, the conduct and statements Kipp alleges do not rise to the level of extremity and outrageousness necessary to support Kipp's claims. We acknowledge the acrimonious relations between Kipp and these Appellees, as well as Kipp's subjective belief that their actions and statements led directly to her current predicament; however, the factual allegations necessary to support a successful IIED claim present a high bar, and Kipp fails to clear it. As such, the trial court did not err or abuse its discretion in sustaining these Appellees' preliminary objections in this regard.[24]

### d. Dismissal of Fifth Amended Complaint with Prejudice

A complaint is properly dismissed with prejudice, that is, without the opportunity for the plaintiff to further amend the complaint, when "leave to amend would be a futile exercise." *Chasan v. Platt*, 244 A.3d 73, 84 (Pa. Cmwlth. 2020).

---

[24] We note that, although Kipp did not allege civil conspiracy against Appellees in a separately enumerated count in her Fifth Amended Complaint, she alleges it generally throughout the Fifth Amended Complaint regarding all her claims. *See, e.g.*, Fifth Amended Complaint at 106 (stating that Saylor, Simpson, Sharp, Downs, Harris, and Mussett conspired to intentionally inflict emotional distress on Kipp by pursuing harassment complaints against her that they knew to be false). Because we uphold the trial court's determination that Kipp failed to state any of her claims with legal sufficiency, her associated civil conspiracy claims are moot. *Morley v. Farnese*, 178 A.3d 919-20 (Pa. Cmwlth. 2018) (stating that if a tort claim is properly dismissed for failure to state a claim, conspiracy cause of action based on the underlying tort claim cannot stand).

Since Kipp filed her initial complaint in January 2020, she has filed multiple amended complaints, several without the trial court's permission or Appellees' consent as required by Civil Procedure Rule 1033(a). Trial Ct. Op., June 23, 2023, at 3-4. As set forth in detail in the factual and procedural section above, the Fifth Amended Complaint is actually the eighth complaint filed by Kipp since January 2020.

The trial court's December 19, 2022, order, which is the subject of this appeal, pointed out Kipp's repeated failure to comply with court orders and rules, as well as her failure to cure her various errors and plead her substantive claims with legal sufficiency despite the multiple opportunities she had taken and been given and the resulting prejudice to Appellees from three years expending time, effort, and legal expenses without a viable complaint against which to defend. Trial Ct. Order, Dec. 19, 2022, at 1-2. Accordingly, the trial court concluded that dismissal with prejudice was warranted. *Id*. at 2. After recounting the entire procedural history in its June 2023 opinion, the trial court reiterated that "to allow any further [a]mended [c]omplaints would be an exercise in futility and unfairly prejudicial to Appellees." Trial Ct. Op., June 23, 2023, at 21. This Court cannot improve on the trial court's presentation, nor can we find fault with its reasoning. As such, the trial court did not err or abuse its discretion in dismissing Kipp's Fifth Amended Complaint with prejudice.

### IV. Conclusion

In light of the foregoing, we affirm the trial court's June 19, 2020, order. We vacate the trial court's December 19, 2022, order only to the extent that its dismissal of Kipp's Fifth Amended Complaint was based on lack of compliance with

43

the Rules of Civil Procedure and otherwise affirm. We also grant Appellees'
motions to strike Kipp's reply brief and appendices to the extent that they contain
extra-record allegations and evidence.


_____

CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lynn M. Kipp,                          :
                    Appellant          :
                                       :
        v.                             :
                                       :
Bellefonte Area School District,       :
Board of School Directors,             :
Michelle Saylor, Michelle Simpson,     :
Kimberly Sharp, Nicolas Downs,         :    No. 263 C.D. 2023
Nicole Harris, and Michael Mussett     :


# O R D E R


AND NOW, this 7th day of October, 2025, the June 19, 2020, order of the Court of Common Pleas of Centre County (trial court) is AFFIRMED. The trial court's December 19, 2022, order is VACATED to the extent that its dismissal of Kipp's Fifth Amended Complaint was based on lack of compliance with the Rules of Civil Procedure and is otherwise AFFIRMED. Appellees' motions to strike Kipp's reply brief and appendices thereto are GRANTED to the extent that they contain extra-record allegations and evidence.


_____
CHRISTINE FIZZANO CANNON, Judge